# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

The two locations described in Attachments A-1 and A-2,
which are further described in Attachments A-1 and A-2,
attached hereto and incorporated herein.

)
)
)
)
)
)

Case No.  MR 25-0136

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 and A-2, which is attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a); 846; and 18 U.S.C. §§ 922(g); 924(c) | PWITD controlled substances; conspiracy to distribute controlled substances; felon in possession of a firearm;  possession of a firearm in furtherance of drug trafficking. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

James Davis / Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date:  January 27, 2025

City and state:  Albuquerque, New Mexico

_____
*Judge's signature*

Kirtan Khalsa, U.S. Magistrate
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

### INTRODUCTION:

1.  I, James Davis, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application for a search warrant to search the residences of MICHAEL GARCIA, aka: "GOMER," (GARCIA) located at Apt B 3410 Crest Ave SE Albuquerque, NM 87106 (Subject Premises 1) and 126 Hartline Rd SW Albuquerque, NM 87105 (Subject Premises 2).

2.  More detailed descriptions and photographs of the Subject Premises1 and Subject Premises 2 are contained within "Attachment A-1" and "Attachment A-2," which has been attached hereto and incorporated herein by reference.

### PURPOSE OF THE AFFIDAVIT:

3.  The FBI Albuquerque Division Violent Gang Task Force ("VGTF"), United States Marshals Service ("USMS"), with information from CoreCivic Intelligence Unit have been engaged in an investigation of several gang members and drug traffickers involved in drug distribution within the Cibola County Correctional Center ("CCCC") located in Milan, New Mexico. The investigation pertains to an intergang conspiracy between CCCC inmates, gang members who are not incarcerated, and their criminal associates, to distribute controlled substances within CCCC. GARCIA and others, are believed to be distributing controlled substances and possessing firearms as a convicted felon within the District of New Mexico. This affidavit is submitted in support of two warrants to search Subject Premises, which are believed to contain evidence of violations of:

   a)  21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

1

b) 21 U.S.C. § 846 conspiracy to distribute controlled substances;

c) 18 U.S.C. § 922(g) felon in possession of firearm or ammunition; and

d) 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime;

The violations listed above shall be referenced as the "Target Offenses" hereinafter.

4.      I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all of my knowledge or summarize all the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I developed information I believe to be reliable from the following sources:

a. Information from undercover Agents and Confidential Human Sources (CHS for both plural and singular);

b. Information provided by law enforcement;

c. Information provided by cooperating defendants who have legal representation and pending charges;

d. Results of physical and electronic surveillance;

e. Information derived from consensually recorded conversations;

f. Records from the FBI National Crime Information Center and New Mexico state prisons, and New Mexico state courts, the U.S. District Courts, and the New Mexico Department of Motor Vehicles.

5.      Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow Agents, task force officers, detectives, intelligence analysts, or CHS

that assisted law enforcement.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE:

6.    I am a Special Agent with the FBI for more than five years. Since 2019, I have worked with the Organized Crime Drug Enforcement Task Force (OCDETF), where I primarily investigated violent repeat offenders involved in federal drug and firearm related crimes. Prior to my assignment to the OCDETF, I served on the FBI Joint Terrorism Task Force. I am currently assigned to Albuquerque's Violent Gang Task Force (VGTF). Conducting operations in the FBI has given me extensive experience in investigating and disrupting organized criminal activities. Throughout my time with the FBI, I have been involved in multiple investigations that have resulted in the arrest and prosecution of members of transnational organized crime groups, as well as individuals involved in drug smuggling, weapons smuggling, human smuggling, and other illegal activities.

7.    In my role within the OCDETF and VGTF, I have arrested several dozen persons for offenses related to drug distribution, gang crimes, firearm violations, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations hide the often-substantial profits generated from their criminal activities.

8.    Having conducted continuous operations along the southwest border, I have developed a deep understanding of the workings of criminal organizations, including their hierarchies, communication methods, and methods for avoiding detection by law enforcement. This has

included conducting surveillance operations, developing and cultivating sources of information, and analyzing data to identify patterns and connections between individuals and groups involved in criminal activities.

9.     Based upon my training, experience, and participation in the investigation of gang/criminal enterprises and DTOs, I am aware individuals engaged in drug distribution and weapons smuggling maintain documents, letters, and records relating to their distribution activities. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence may include telephone numbers, telephone books, address books, travel receipts, records in fictitious or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as MoneyPak, Green Dot, or other debit cards, bulk United States currency, money collection logs, such as "tally" sheets, drug load sheets, or shipping/mailing receipts.

10.     I know members and associates of DTOs have access to, and often utilize, numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed persons involved in drug trafficking or gangs use messaging applications and pre-paid phones requiring no subscriber information, and even use fictitious names, or the names of others, to register the cellular phones used to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further illicit activities, photographs and videos of controlled substances, drug proceeds, and/or firearms. In addition, I am also familiar with the increasingly popular use of text messaging, instant messaging, and electronic mail, used by gang/criminal enterprises and DTOs to advance their

unlawful activities. I am aware such messaging applications and services can be utilized from computers and certain computer applications can send messages that appear to be cellular telephone text messages.

11.     I know that fugitives are often aware of their status as a fugitive, and work hard not to get caught by law enforcement. I know that fugitives will maintain multiple locations and will limit their time at each location to further avoid law enforcement detection.

12.     I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire firearms. I also know that persons who commit armed robberies typically utilize firearms during those crimes as a means to obtain submission from potential victims, especially when victims are also involved in drug trafficking.

13.     I know that individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug and weapons trafficking bury evidence underground in various containers on their property. This evidence, which is discussed in detail in the following paragraphs, includes records and evidence of drug transactions, proceeds from drug

sales, including United States (U.S.) Currency and other financial instruments, and other valuables obtained from proceeds, and records of drug trafficking.

14.    I am aware that members of DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, especially when debts remain open; the status of accounts receivable and accounts payable; the names and phone numbers of suppliers, customers, co-conspirators, and other associates who may assist drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money (U.S. Currency derived from drug trafficking), through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection of law enforcement, and any reporting requirements of banking institutions. These records can be maintained on cellular telephones, computers, and/or on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets (drug ledgers), IOU's, miscellaneous notes, money orders, customer lists, and phone address books. I have personally been involved in search warrants which resulted in the discovery of such records that were more than one year old.

15.    It has been my experience that individuals involved in drug distribution possess items of identification, including but not limited to driver's licenses, rent receipts, bills, and address books. These items are relevant to the identity of the defendant(s), possessor of the items seized, and occupants of the premises searched.

16.    Lastly, it has been my experience that the items I described herein are often stored by

members of DTOs in their businesses, residences, vehicles, and surrounding garages, outbuildings, and yards, on their persons, and in the residences of friends or relatives.

**BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS:**

17.    Based upon my training, experience, and participation in this investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information:

a)  Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

b)  Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated.

c)  I am aware gang members aggressively pursue informants, suspected informants, and

persons who betray the gang(s). I am aware gang members relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail."

d) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood corrections officers will monitor the call.

e) I know that members and associates of gang/criminal enterprises and DTOs maintain stash houses, rental properties, apartments, storage units, and similar assemblies to store controlled substances and drug proceeds.

f) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, to avoid detection by law enforcement.

g) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences, businesses, storage units, stash houses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, storage units, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

h) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and

9

diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy and electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

i)  Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

j)  I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang members, and they are expected to possess and maintain firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

k)  I know that fingerprints and DNA evidence may be transferred to drug packaging materials, firearms, and ammunition.

l)  The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences, stash houses, and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

**THE CONFIDENTIAL HUMAN SOURCES:**

18.  During the course of the instant investigation, FBI Agents utilized three Confidential Human Source's (CHS) to infiltrate GARCIA's drug network and his criminal associates. Agents

encouraged the CHS to maintain contact with the Target Subjects who were engaged in ongoing criminal activity. By doing so, the CHS have exposed himself/herself to a violent death should his/her identities become known. I have sought to provide the Court with some of the underlying circumstances and background information I relied upon in determining the information from the various CHS was reliable.

19.    Regarding the veracity of the CHS reporting herein, I am aware that gangs kill former members and associates who tell their secrets, which means the gangs themselves appear to consider CHS' accounts to be reliable and accurate enough to silence them. I believe it is important to note CHS-1 and CHS-3 have extensive experience with the criminal justice system, incarceration, and gang subculture. The information the various CHS' provided on the drug trade involving GARCIA is impressive. In speaking with FBI Agents, the information the CHS' provided could be viewed as a statement against interest, as two of the CHS' admitted to participating in criminal gang and/or drug activity.

20.    In the paragraphs that follow, I will provide an overview of the CHS, to include:

    a)  their basis of knowledge concerning the criminal conduct;

    b)  motivation to assist the FBI;

    c)  criminal history;

    d)  any compensation received from the government; and

    e)  a statement concerning their reliability.

21.    I tried to provide sufficient information to the Court, while balancing the anonymity and safety of the various CHS. The CHS described herein expressed fear of retaliation and death if their identities became known to the gang.

22.     CHS-1 is a gang associate and has previously worked with a cartel. CHS-1 grew up in a gang neighborhood and has extensive personal knowledge of the target subject and the target subjects drug activity. CHS-1 has assisted law enforcement in the instant investigation as well as several other investigations, resulting in two arrests. CHS-1 was arrested by the FBI and is motivated to assist the FBI in hope of receiving a positive recommendation in a pending criminal matter. CHS-1 has received felony convictions for possession of a controlled substance, shoplifting, and fleeing a law enforcement officer. I believe the information provided by CHS-1 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS has provided.

23.     CHS-2 has no felony convictions and is motivated to help a family member receive a positive recommendation in a pending criminal matter. CHS-2 grew up in and around Albuquerque gangs and has extensive personal knowledge of the target subject and the target subjects drug activity. CHS-2 is associated with GARCIA. CHS-2 has known GARCIA for approximately 4 years. CHS-2 has not received any financial assistance from the FBI. Information provided by the CHS-2 has proven to be reliable in the past and I have not been given reason to doubt the integrity of the information provided by the CHS-2.

24.     CHS-3 is a gang associate and has previously worked as a narcotics distributor in the Albuquerque area. CHS-3 grew up in a gang neighborhood and has extensive personal knowledge of the target subject and the target subjects drug activity. CHS-3 has a pending criminal case for felon in possession of firearm and is motivated to assist the FBI in hope of receiving a positive recommendation in a pending criminal matter.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE:

25.    FBI Agents and task force officers in Albuquerque are investigating several gang members and associates that are attempting to introduce contraband into CCCC. Much of the investigation was predicated on information from CHS, two of whom have infiltrated the organization and/or distributed drugs with the Target Subject, GARCIA. Case Agents advised the various sources to maintain contact with the Target Subject and attempt to learn more about GARCIA's operation. The CHS did so and in the weeks that followed, reported significant intelligence on the inner workings of the organization.

### Target Subject: MICHAEL GARCIA, aka: "GOMER"

26.    On October 2, 2024, the FBI obtained an arrest warrant for GARCIA for his role involved in the introduction of contraband to CCCC. A federal grand jury indicted GARCIA for: 18 U.S.C. § 1791 provide a prohibited object to a prisoner for his role involving an attempt to introduce heroin, buprenorphine, and mobile telephones in a package destined for a prisoner in CCCC. GARCIA has been on the run from law enforcement for over two years and has made it onto the "METRO 15" wanted poster pictured below. GARCIA is pictured on the bottom right of the poster. He is currently wanted for a failure to appear for a prior conviction of a felon in possession of firearm.



## METRO 15

**Cindi Lucero**
Age: 40
Aggravated Battery (GBH)

**Dion Lopez**
Age: 48
Aggravated Battery (DW)

**Walter Chavez**
Age: 34
Aggravated Battery (DW)

**Kalani Hodges**
Age: 23
Homicide by Vehicle

**Robert Johnson**
Age: 34
Criminal Sexual Penetration

**Leonardo (Jose) Pardo**
Age: 30
Possession of a Firearm

**Eric Gomez**
Age: 38
Criminal Sexual Penetration

**Leonard Jones**
Age: 44
Aggravated Stalking

**Emanual Bahe**
Age: 42
Criminal Sexual Penetration

**Manuel Maestas**
Age: 26
Child Abuse (GBH)

**Gregory Martinez**
Age: 32
Agg Assault (DW)

**Julio Leyva**
Age: 55
Criminal Sexual Penetration

**Matthew Bartholemew**
Age: 42
Kidnapping

**Isaiah Elijah Anthony Hayes**
Age: 20
Child Abuse (Death)

**Michael Garcia**
Age: 45
Possession of a Firearm

Warrants must be verified before arrest. These fugitives should be considered dangerous and might possibly be armed. Never attempt to detain or apprehend these subjects yourself.
Please call **Crime Stoppers at 505-843-STOP** with any information you may have as to the whereabouts of these individuals.
REVISED 09/05/2024



**Michael Garcia**
**Age: 45**
**Possession of a Firearm**

27.    CHS-1 has extensively dealt drugs with and for GARCIA. Historically, CHS-1 advised

agents that GARCIA is a significant distributor of fentanyl, meth, and heroin. Specifically, CHS-

1 has obtained boats (street term for 1,000 fentanyl pills) and/or pounds of both methamphetamine

and heroin from GARCIA on more than two dozen separate occasions. CHS-1 has always known

GARCIA to be armed and possess a bullet proof vest. CHS-1 has personally observed GARCIA

in possession of more than a dozen guns, familiar to CHS-1 as AR-15 and AK-47 style rifles. CHS-

1 last had contact with GARCIA approximately 12 months ago.

28.    CHS-2 advised agents that GARCIA always keeps drugs in the back of his vehicle, a white

Mercedes. In November 2024, CHS-2 observed GARCIA to be in possession of a handgun.

29.    In December 2024, CHS-3 advised agents that GARCIA drove a white Mercedes with grey

rims, which was parked at Subject Premises 1. CHS-3 advised agents that GARCIA maintained

multiple "stash houses" across Albuquerque where guns and drugs are kept. CHS-3 advised that

Subject Premises 1 was occupied by a family member of GARCIA's.

30.    On December 20, 2024, VGTF surveillance agents observed a white Mercedes at the

Subject Premises, consistent with what CHS-3 advised. Below is a photograph of a white Mercedes

with grey wheels parked outside of Subject Premises 1.



31.     Agents spoke with a postal inspector who advised that GARCIA received mail at Subject Premises 1 approximately 6 months ago. Agents were advised by the postal inspector that JOSEFITA SANCHEZ MARIE GARCIA is currently receiving mail at Subject Premises 1.

32.     CHS-3 advised agents that the Subject Premises 1 has been and remains to be a known drug stash house of GARCIA's and a hangout for felons, drug addicts, and even fugitives.

## SURVEILLANCE

33.     In the following weeks, VGTF agents conducted surveillance at Subject Premises 1 and observed a multitude of short duration stops and hand to hand transactions consistent with drug trafficking.

34.     On January 10, 2025, agents conducted surveillance on Subject Premise and observed over 30 short durations stops consistent with narcotics transactions. I will provide specific details for four relevant transactions, all times are approximate.

35.     Transaction 1: January 11, 2025, approximately 11:15 PM, a silver SUV arrived at Subject Premises 1, the driver of the silver SUV knocked on Subject Premises 1 door, met by an unknown individual (UI). The driver shook hands with UI and returned directly to silver SUV. The silver SUV departed at approximately 11:17 PM.

36.     Transaction 2: January 11, 2025, at approximately 11:27 PM, two vehicles arrived at Subject Premises 1, a black truck and a white SUV. Two individuals from each vehicle approached the door of Subject Premises 1 and knocked, stood in the door frame and appeared to engage in conversation with UI. UI shook the hand of the driver of the black truck. The driver of the black truck and passenger departed approximately one minute afterwards. At approximately 11:28 PM, the driver of the white SUV appeared to greet UI, the driver shook UI's hand and entered Subject

17

Premises 1. A person unaffiliated to the aforementioned vehicles approached Subject Premises 1, knocked, shook the hand of UI, and entered Subject Premises 1 at 11:34 PM and exits at 11:35 PM. At 11:54 PM, the driver of white SUV exited Subject Premises 1 with a bag they did not enter with, entered the white SUV and departed the area.

37.    Transaction 3: January 12, 2025, at approximately 12:47 AM, a person in a yellow jacket arrived at Subject Premises 1, shook the hand of UI, and entered Subject Premises 1. The person in a yellow jacket departed Subject Premises 1 at 12:49 AM.

38.    Transaction 4: January 12, 2025, at approximately 10:11, a male in a red shirt approached Subject Premises 1, knocked on the door, and a hand to hand transaction took place through the metal gated door. The male in the red shirt departed Subject Premises 1 before 10:12 PM.

39.    Within the past week CHS-3 observed GARCIA at Subject Premises 2. CHS-3 observed GARCIA to be in possession of suspected fentanyl pills, heroin, hand guns, and a rifle inside Subject Premises 2. Agents observed CHS-3 enter the property of Subject Premises 2. Prior to and during CHS-3's arrival to Subject Premises 2, agents observed three vehicles conduct short duration stops outside Subject Premises 2.

40.    On January 23, 2025, agents from the United States Marshalls Service (USMS) received GPS location data after executing a search warrant for location data for a cell phone, (TARGET PHONE 1) believed to be in possession of GARCIA. The location data received displayed TARGET PHONE 1 at Subject Premises 2 over 30 times in the last 24 hours. USMS had previously conducted a pen register trap and trace (PRTT) on a cell phone (TARGET PHONE 2) believed to be operated by GARCIA which also provided location data with a similar radius to the active location data on TARGET PHONE 1. The PRTT data revealed that TARGET PHONE 2 was in

contact with multiple cell phone numbers captured in separate narcotics cases. CHS-3 advised agents that GARCIA would utilize a cell phone to coordinate drug deals between them. CHS-3 has also been present with GARCIA and has observed GARCIA utilize a cell phone to coordinate drug deals with others. CHS-3 had provided both TARGET PHONE 1 and TARGET PHONE 2 phone numbers to law enforcement.

41.    Based on the recent activity at Subject Premises 1 and Subject Premises 2, I believe there is probable cause to search for violations of Target Offenses and evidence of GARCIA's whereabouts.

## BIOMETRIC ACCESS TO DEVICES:

42.    Based on my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

43.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by

other manufacturers have different names but operate similarly to Touch ID.

44.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

45.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

46.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a

heightened concern about securing the contents of a device.

47.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

48.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, is inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

49.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the

facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that the Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## **CONCLUSION:**

50.     Based on the aforementioned information, I submit that probable cause exists to search Subject Premises 1 and Subject Premises 2 described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 18 U.S.C. § 922(g) felon in possession of firearm or ammunition; and 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime. This affidavit has been reviewed by Assistant United States Attorney Paul Mysliwiec, of the District of New Mexico.


Respectfully submitted,

22

James Davis
FBI Special Agent

Electronically submitted and telephonically sworn to before me on January 27, 2025.

The Honorable Kirtan Khalsa
United States Magistrate Judge

## **ATTACHMENT A-1**

<u>Premises to be Searched:</u> The Subject Premises is located at 3410 Crest Ave SE, Apartment B, Albuquerque, New Mexico 87106. The Subject Premises may be described as a single-story residence, with gray stucco siding, a white trim roof, and iron bars covering the windows. The front door is white and covered by a black protection gate with silver door handle. A color photograph of the Subject Premises is contained below. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the occupants of the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises.



## **ATTACHMENT A-2**

Premises to be Searched: The Subject Premises is located at 126 Hartline Road Southwest,

Albuquerque, New Mexico 87105. The Subject Premises may be described as a single-story

residence, with grey siding, and a cinderblock wall that surrounds the property with a red sliding

gate at the entrance. The numbers "126" are marked on the cinderblock wall on the adjacent

structure to the west. A color photograph of the Subject Premises is contained below. The search

of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and

storage containers designated for use by the occupants of the Subject Premises contained within

the yellow square. The search shall also include vehicles parked at, or in front of, the Subject

Premises provided such vehicle has an apparent connection to the Subject Premises.







Bernalillo County Parcel Search for 126 Hartline Rd Sw. (Entire property Surround by blue and green lines with Subject Premises 2 Surrounded by yellow)

# **ATTACHMENT B**

### **Items to be Seized:**

All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 18 U.S.C. § 922(g) felon in possession of firearm or ammunition; 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime to include:

1. Controlled substances, drug packaging material, paraphernalia, and scales;

2. Firearms, magazines, and ammunition;

3. United States currency;

4. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders, money order receipts, pre-paid money cards or other debit cards, and any documents relating to transporting, ordering, purchasing, transporting, or distributing drugs;

5. Cellular telephones;

6. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

7. Safes, combinations or key-lock strong boxes or other secure storage containers, and types of. locked or containers, and hidden compartments that may contain any of the foregoing.

During the execution of the search of the PREMISES described in Attachment A1-A2, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.